**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MAVEL, A.S.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**RYE DEVELOPMENT, LLC; FFP MISSOURI 5, LLC; FFP MISSOURI 12, LLC; and SOLIA 6 HYDROELECTRIC, LLC,**<br><br>**Defendants.** | **Civil Action No.**<br>**21-11759-FDS** |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**SAYLOR, C.J.**

This is a dispute concerning the alleged disclosure of confidential information and trade secrets. Mavel, a.s. ("Mavel") is a Czech joint-stock company that engineers and fabricates equipment for small hydroelectric power plants. Mavel Americas, Inc. ("Mavel Americas") is a wholly-owned subsidiary of Mavel. Rye Development, LLC ("Rye") is in the business of developing, investing in, and owning low-head hydropower energy projects.

According to the complaint, Mavel and Rye had a working business relationship, and during that time, Mavel provided Rye with equipment recommendations for some of its ongoing projects. The complaint alleges that Rye improperly shared that confidential information with a direct competitor. At the time of the alleged disclosure, Mavel and Rye were operating under a memorandum of understanding that contained both a confidentiality agreement and an arbitration

clause.

Mavel has sued Rye, asserting claims for (1) breach of oral contract, (2) breach of implied-in-fact contract, (3) promissory estoppel, (4) unjust enrichment, (5) breach of non-disclosure agreement, and (6) violations of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839. Rye has moved to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

For the reasons set forth below, the motion will be granted as to Count 6, which is the only federal claim, as that claim is subject to binding arbitration. The Court will decline to exercise supplemental jurisdiction over the remaining state-law claims, and the case will therefore be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

## I. Background

### A. Factual Background

The facts are set forth as alleged in the complaint.

#### 1. The Parties

Mavel, a.s., is a Czech joint-stock company. (Compl. ¶ 7). It engineers and manufactures equipment for small hydroelectric power plants. (*Id.* ¶ 17). While it offers a full range of turbines, it is particularly known for the design and production of low-head Kaplan PIT turbines. (*Id.* ¶¶ 19, 21). Kaplan turbines generally represent the majority of the company's business. (*Id.* ¶ 21). It is currently in the process of expanding its Kaplan turbine business in the United States, where such projects have been uncommon. (*Id.* ¶ 23).

Mavel Americas, Inc., is a wholly-owned subsidiary of Mavel. (*Id.* ¶ 7). Mavel Americas is a Delaware corporation with a principal place of business in Boston, Massachusetts. (*Id.*).

Rye Development, LLC is a limited liability company organized under Delaware law and with members who are citizens of Massachusetts. (*Id.* ¶ 8).[1] It develops, invests in, and owns low-head hydropower and pumped-storage energy projects. (*Id.* ¶ 25). Its projects primarily focus on developing and improving existing dams. (*Id.*).

In addition, Rye is the parent company of three limited liability companies that are also named as defendants: FFP Missouri 5, LLC; FFP Missouri 12, LLC; and Solia 6 Hydroelectric, LLC. (*Id.* ¶ 26). Those companies were created to operate hydroelectric facilities in Pennsylvania. (*Id.*).

**2. <u>The 2014 Memorandum of Understanding</u>**

As of 2011, Mavel and Rye had a working business relationship. (*Id.* ¶ 27). In 2014, Mavel Americas and a predecessor-in-interest to Rye entered into a Memorandum of Understanding ("MOU") to govern their relationship. (*Id.* ¶ 28).[2] That document "outlined the nature and extent of the understanding between the Parties" and included agreements for Mavel Americas to supply turbines for eight of Rye's projects. (*Id.*). Mavel was not a party to the MOU. (*See* Dkt. No. 36, Ex. A ("MOU") at 11).[3]

---

[1] According to the Massachusetts Secretary of State website, Rye has two members who are both citizens of Massachusetts. *See* MASSACHUSETTS SECRETARY OF STATE, https://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx. (last visited Sept. 1, 2022).

[2] For the sake of convenience, the Court will use the term "Rye" to describe the party to the MOU.

[3] On a motion to dismiss, the court may properly take into account four types of documents outside the complaint without converting the motion into one for summary judgment: (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *see also Arturet-Velez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n.2 (1st Cir. 2005) ("The court can consider . . . implications from documents incorporated into the complaint."). Although the MOU was not attached to the complaint, this Court can properly consider it because it is both central to plaintiff's claims and it is sufficiently referred to in the complaint.

As paraphrased in the complaint, section 3.3 of the MOU contained a confidentiality provision that provided, in substance, that "neither party shall use the other party's confidential information for any purpose not connected with projects referenced in the MOU." (*Id.* ¶¶ 31, 64). The complaint alleges that throughout the duration of their working relationship, Mavel, Mavel Americas, and Rye were operating under the confidentiality agreement of the MOU to "ensure that each Party's confidential and trade secret information was fully protected." (*Id.* ¶ 64).

According to sections 12.1 through 12.4 of the MOU, any disputes concerning the subject matter of the MOU are subject to binding arbitration. (MOU at 9-10).

### 3. Oral Agreements between Mavel and Rye

In late 2020, the Chairman of Mavel, Jeanne Hilsinger, and the CEO of Rye, Paul Jacob, discussed Rye's plans concerning various projects. (*Id.* ¶ 33). During that time, Jacob allegedly confirmed that Rye was able to finance the projects and "was interested in continuing its business relationship with Mavel as Rye's preferred provider." (*Id.*).

The complaint alleges that on September 11, 2020, Jacob orally agreed that Mavel would receive three contracts from Rye. (*Id.* ¶ 34). These are referred to as the "Phase I projects" and include the Allegheny, Montgomery, and Emsworth projects. (*Id.*).

### 4. Mavel's Work in Furtherance of Phase 1 Projects

In October 2020, the parties agreed that Mavel would begin designing the Phase 1 projects. (*Id.* ¶¶ 37-38). According to the complaint, such work is "[u]nlike preliminary work that is often done in the marketing or bidding process," but is "true contractual 'Basic Desig[n].'" (*Id.* ¶ 38). The work includes "developing technical data and design . . . as well as procuring bids for subcomponents such as generators and gearboxes." (*Id.* ¶ 39).

In November 2020, Mavel sent Rye its first set of preliminary data for the Phase I projects. (*Id.* ¶ 41). For all three Phase 1 projects, this included providing drafts of its confidential technical specification packages that were developed using proprietary software and unique Mavel turbine designs. (*Id.* ¶ 42). In addition, Mavel sent proprietary "Water Passage Drawings" that "represent highly engineered design, based on extensive hydraulic analysis" and confidential and proprietary CAD drawings. (*Id.* ¶ 44).

In January 2021, Rye requested amended project-pricing plans to accommodate changes in the Phase 1 projects, and Mavel accommodated these changes. (*Id.* ¶¶ 47-48). Shortly thereafter, Rye encountered unexpected costs for one of the projects and asked Mavel to again adjust the plans accordingly. (*Id.* ¶ 50). Ultimately, Rye requested that all three projects be redesigned so that they would use the same type of turbine. (*Id.* ¶ 51). To do that, "Mavel had to provide significant additional engineering analysis and modeling to develop equipment configurations for all three projects." (*Id.* ¶ 51).

By February 2021, the parties had initiated weekly technical engineering meetings. (*Id.* ¶ 53). During those meetings, Mavel "would orally convey much of the confidential data and information" and provide written materials to update Rye on the progress of the projects. (*Id.*). In addition, over the next several months, Mavel provided Rye with proprietary and confidential drawings and data, including work on "special projects" within each Phase 1 project that involved "basic design development." (*Id.* ¶¶ 54, 56-59). "Overall, Rye received more than eight months' worth of work, modifications of that work, and the best of Mavel's proprietary engineering." (*Id.* ¶ 61).

**5. <u>Developments in June 2021</u>**

According to the complaint, after discussing the Phase 1 contracts with Mavel, the CEO of Rye indicated his intention to enter a formal contract some time in 2020. (*Id.* ¶ 35). The

parties planned to mirror the terms of their eight "pre-negotiated existing contracts," and Mavel sent Rye a draft of such a contract on November 4, 2020. (*Id.* ¶¶ 35, 40).

In June 2021, the representatives of Mavel and Rye met in Florida to discuss finalizing the contract. (*Id.* ¶ 62). There, they successfully finalized the non-material, commercial terms and otherwise maintained all of the material aspects of the contract such as scope of the work, pricing, and delivery. (*Id.*). The parties then agreed that the next step would be to have their respective attorneys revise the contract. (*Id.* ¶ 63). According to the complaint, at that point Rye's general counsel "threw up new road-blocks, rejecting much of the work agreed to at the [Florida] meeting." (*Id.*). She also informed Mavel that Rye had solicited competitors of Mavel for competing bids. (*Id.*).

**6. <u>The Execution of the NDA</u>**

The complaint further alleges that when Mavel learned Rye was discussing the project with other companies to garner competing bids, it "insisted" they sign an additional non-disclosure agreement ("NDA"). (*Id.* ¶¶ 64-65). Specifically, it alleges as follows:

> Although the Parties had been operating under the confidentiality agreement of the MOU (Section 3.3), to ensure that each Party's confidential and trade secret information was fully protected, Mavel further insisted that the Parties execute an additional non-disclosure agreement ("NDA") to protect the proprietary and confidential information it was providing to Rye.

(*Id.* ¶ 64).

The NDA was executed on June 23, 2021. (*Id.* ¶ 65). In addition to Mavel and Rye, Mavel Americas is a party to the NDA. (Compl., Ex. 1 ("NDA") at 5).

The NDA contained a provision whereby Rye represented "that it has not disclosed any written Confidential Information of Mavel to a Direct Competitor of Mavel in the eighteen (18) months prior to the Effective Date of this Agreement." (*Id.* at 3, Section 11). Unlike the MOU, the NDA does not contain an arbitration clause. (*See generally id.*).

**7. The Alleged Disclosure of Confidential Information**

According to the complaint, on June 24, 2021—the day after the NDA was signed—Rye's Vice President of Project Engineering, Ushakar Jha, told Mavel's Chief Technology Executive, Rostislav Pospíšil, that Rye "had received a proposal from a competitor, Andritz, after the competitor was informed of Mavel's confidential specifications." (*Id.* ¶ 66). Allegedly, Andritz's proposal provided for slightly improved Kaplan PIT turbines to "gain a competitive advantage" over Mavel. (*Id.*).

As a result of the alleged disclosures and Rye's delays in finalizing the written contract, Mavel sent a letter on September 3, 2021, suspending the Phase I projects and demanding that Rye follow section 2(e) of the NDA and "return and/or destroy" all of Mavel's confidential information. (*Id.* ¶ 69). That email also instructed Rye not to use any of the confidential information in any future work product. (*Id.*).

Mavel sent a second letter on September 15, 2021, requesting that the confidential information be returned and asking for a list of the other parties to whom Rye gave Mavel's confidential information. (*Id.* ¶ 70). Rye responded on October 13, 2021, stating that it had destroyed Mavel's confidential information pursuant to section 2(e) of the NDA. (*Id.* ¶ 71). According to the complaint, Rye should have returned the information as requested in its second email and further complains that Rye "completely" ignored its request for a list of parties to whom disclosures were made. (*Id.* ¶ 72).

The complaint alleges that "Rye had obtained and utilized Mavel's confidential data to continue to move the projects forward while going to competitors to secure better terms." (*Id.* ¶ 68). In addition, it alleges that the final technical specifications that Rye received in April 2021 included Mavel's proprietary and confidential engineering trade secrets, such that a competitor could use the final product that was in Rye's possession to reverse-engineer those proprietary

methods. (*Id.* ¶¶ 56-57). According to the complaint, Rye's failure to deny having shared confidential information and to assure Mavel it would not use the information in the future constituted a "refus[al] to provide any information that would allow Mavel to protect itself." (*Id.* ¶ 72).

Mavel claims more than $2 million of damages resulting from more than 5,000 personnel hours and "additional [invested] resources," as well as more than $30 million from the loss of the three contracts. (*Id.* ¶¶ 73-74). Finally, it claims damages generally related to the disclosure of confidential information. (*Id.* ¶ 75).

## II. Procedural Background

The complaint, which was brought by Mavel (but not Mavel Americas), asserts six claims against defendants. Count 1 is a claim for breach of the alleged oral agreement. Count 2 is a claim for breach of an implied-in-fact contract. Count 3 is a claim for promissory estoppel based on Mavel's reliance that Rye wanted to work with it. Count 4 is a claim for unjust enrichment both for the sum of $2 million and for any of Mavel's confidential information Rye still retains. Count 5 is a claim for breach of the parties' non-disclosure agreement. Count 6 is a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839.

Defendants have moved to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## III. Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted). "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## IV. Analysis

### A. The DTSA Claim

Plaintiff's only federal claim is misappropriation of trade secrets in violation of the DTSA. The DTSA creates a private right of action for the "owner of a trade secret that is misappropriated." *See* 18 U.S.C. § 1836(b)(1). It defines "trade secret" broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information." 18 U.S.C. § 1839(3). For the information to qualify as a "trade secret," the owner must take "reasonable measures to keep such information secret," and the information must "derive[ ] independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means." 18 U.S.C. § 1839(3)(A)-(B).

The DTSA was enacted in 2016. (Pub. L. 114-153, 130 Stat. 376). Since its enactment, the First Circuit has not spoken as to what constitutes "reasonable measures" under the DTSA. However, it has addressed what constitutes "reasonable measures" under Mass. Gen. Laws ch. 93, § 42, and the "Massachusetts trade secret law is nearly equivalent to the DTSA."

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d 89, 94 (D. Mass. 2019). Under Massachusetts law, a plaintiff must take "reasonable measures" to protect its claim secrets, including "affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 53 (1st Cir. 2007); *see also J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 738 (1970) (explaining that protecting a trade secret "calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it"). "The fact that [Mavel] kept its work for [Rye] private from the world is not sufficient; discretion is a normal feature of a business relationship." *Incase Inc.*, 488 F.3d at 53.

Generally, other circuits have recognized that confidentiality agreements and non-disclosures are sufficient to constitute "reasonable measures" within the meaning of the DTSA. *See, e.g.*, *Turret Labs USA, Inc. v. CargoSprint, LLC*, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022) (explaining that the "reasonableness analysis will often focus . . . on the importance of confidentiality and nondisclosure agreements to maintaining secrecy"); *Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020) (holding that under the DTSA, a company that, "without a confidentiality agreement and without other policies or practices for safeguarding secrets" did not take reasonable steps to safeguard its trade secrets); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020) (holding, under the DTSA, that "[c]onfidentiality provisions constitute reasonable steps to maintain secrecy"); *see also Mintz v. Marketing Cohorts, LLC*, 2019 WL 3337896, at *6 (E.D.N.Y. July 25, 2019) (dismissing a DTSA claim because plaintiff "did not require defendants to sign a non-disclosure agreement nor any sort of covenant" to protect the confidential information).

**1. Whether the MOU Applies to the Alleged Disclosures**

This case involves two separate confidential agreements—the MOU and the NDA—that were in effect during different times. The MOU was executed in 2014, and the NDA was executed on June 23, 2021. (Compl. ¶¶ 28, 65).

As noted, the MOU includes a confidentiality provision that governs the disclosure of proprietary information. (Compl. ¶ 31). The only signatories to the MOU are Mavel Americas, which is not a party to this suit, and Rye. (MOU at 11). However, neither party disputes the enforceability or validity of the MOU, or that it was understood by all parties to be in effect and applicable to their conduct at the relevant times. *See VBS Distribution, Inc. v. Nutrivita Lab'ys, Inc.*, 811 F. App'x 1005, 1009 (9th Cir. 2020) ("Providing alleged trade secrets to third parties does not undermine a trade-secret claim, so long as the information was provided *on an understanding of confidentiality*.") (internal quotation marks omitted) (emphasis added). Under the circumstances, the Court will assume that the confidentiality agreement in the MOU is sufficient to constitute "reasonable measures" under the DTSA.[4]

The complaint does not allege any specific conduct that resulted in a disclosure of confidential information that occurred after June 23, 2021. It only contains specific allegations regarding the disclosure of confidential information that occurred prior to that date. (*See* Compl. ¶¶ 63, 66, 68).[5] Specifically, it alleges that Mavel became aware that "Rye had gone to one or

[4] The Court will also assume, without deciding, that the fact that the confidentiality agreement was entered into by a wholly-owned subsidiary, not the plaintiff parent, does not require a different result.

[5] The NDA was signed by Mavel and Rye on June 23, 2021. (Compl. ¶ 65). The complaint alleges that Mr. Jha, Rye's Vice President of Project Engineering, spoke with Mavel's Chief Technology Executive on June 24, 2021, and stated that Rye had previously asked Mavel's competitors for proposals of equipment and design for some of their projects. (*Id.* ¶ 66). It also alleges that one of Mavel's direct competitors, Andritz, had been informed of Mavel's confidential specifications. (*Id.*). Based on that timeline, the alleged disclosure of confidential information to Mavel's competitors occurred prior to the signing of the NDA on June 23, 2021, and occurred when the MOU was the only confidentiality agreement in place between the parties.

more of Mavel's competitors to secure new bids" in "early June of 2021." (*Id.* ¶¶ 62-63). And it alleges that on June 24, 2021, during a conversation with Rye's Vice President of Project Engineering, Mavel learned that Rye had "received a proposal from a competitor, Andritz, after the competitor was informed of Mavel's confidential specifications." (*Id.* ¶ 66). Those alleged disclosures, therefore, must have occurred prior to the signing of the NDA, and while the MOU was the only confidentiality provision in effect.

Indeed, Mavel's own brief indicates that the basis of its DTSA claim is the alleged disclosure to Andritz, which necessarily occurred prior to the signing of the NDA. (Dkt. No. 60, Pl. Opp. at 7) (stating that "Mavel plausibly pled Rye's misappropriation under the DTSA by disclosing Mavel's trade secrets to Mavel's competitor, Andritz"). And Mavel asserts that prior to the NDA, the parties "were operating under a Memorandum of Understanding." (*Id.* at 9).

Nonetheless, Mavel contends that the NDA would be applicable to the alleged disclosures, regardless of whether those disclosures occurred prior to June 23, 2021. Its argument is based entirely on section 11, which states: "Rye expressly represents that it has not disclosed any written Confidential Information of Mavel to a Direct Competitor of Mavel in the eighteen (18) months prior to the Effective Date of this Agreement." (NDA at 3); (Pl. Opp. at 3, 9-10). Such a provision does not, however, give some type of retroactive effect to the NDA, such that the NDA applies to conduct prior to its signing. Mavel may have (1) a claim against Rye for fraudulent inducement, as it appears that Rye may have signed the agreement knowing that the representation was false, (2) a claim for breach of the NDA, (3) or both. Regardless, section 11 of the NDA does not displace the MOU as to conduct occurring prior to June 23. Thus, because the MOU was the only contract that was in effect at the time of the alleged disclosures, it governs the dispute at issue here.

### 2. <u>Whether the Dispute Concerning the Disclosures Is Arbitrable</u>

Defendants contend that the DTSA claim must be dismissed because the MOU requires arbitration of that dispute. The Court agrees.

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the enforcement of written arbitration agreements implicating interstate commerce. "Congress enacted the FAA in response to widespread judicial hostility to arbitration." *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, (2011)). Section 2 is the "primary substantive provision of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). It provides, in relevant part, as follows:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. § 2.

The Supreme Court has "described this provision as reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'" *Concepcion*, 563 U.S. at 339 (first quoting *Moses H. Cone*, 460 U.S. at 24; and then *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). In line with those principles, "courts must place arbitration agreements on an equal footing with other contracts." *Id.* They must also "'rigorously enforce' arbitration agreements according to their terms." *Italian Colors Rest.*, 570 U.S. at 233 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

"The final phrase of § 2, however, permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Concepcion*, 563 U.S. at 339 (quoting 9 U.S.C. § 2). That savings clause allows arbitration agreements to be invalidated by "'generally applicable contract defenses, such as

fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Furthermore, the FAA's requirement that arbitration agreements be enforced according to their terms "holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *Italian Colors Rest.*, 570 U.S. at 233 (quoting *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012)).

In short, arbitration agreements that are validly formed under state contract law must be enforced according to their terms under section 2 of the FAA, unless one of two exceptions applies. First, an arbitration agreement may be invalidated on any ground that would make a contract unenforceable, such as unconscionability or illegality. *Concepcion*, 563 U.S. at 339. Second, the application of the FAA may be precluded by another federal statute's contrary command. *CompuCredit*, 565 U.S. at 98.

"A party who is seeking to compel arbitration must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Soto–Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011) (internal quotation marks and citation omitted). "Whether or not a dispute is arbitrable is typically a question for judicial determination." *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011). "Therefore, 'except where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter.'" *Id.* (quoting *Granite Rock Co. v. International Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)).

When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration, 9 U.S.C. § 3, or compelling the parties to arbitrate and dismissing the action, 9 U.S.C. § 4. *See DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 106-07 (D. Mass. 2001).

Here, the MOU includes the following arbitration provision:

> A dispute ("Dispute") under this MOU shall be first resolved by attempted negotiation at the highest executive levels between the Parties. If the Dispute has not been resolved within ninety (90) days of the delivery of the Notice of Dispute, then the Dispute shall be resolved by final and binding arbitration to be held in New York, in accordance with the Commercial Arbitration Rules of the AAA then in effect (the "Rules").

(MOU at 9). The MOU also governs the release of confidential information. (*Id.* at 6). The MOU states in part:

> The receiving Party's disclosure of Confidential Information shall be restricted to those employees of the receiving Party who are directly participating in the contractual efforts. Under no other circumstance shall the receiving Party release or disclose Confidential Information during the term of this MOU, and for two (2) years after the termination of this MOU, unless the Parties enter into a Turbine Supply Agreement.

(*Id.*). Because the MOU governs the release of confidential information, a dispute over whether confidential information was inappropriately shared or misappropriated is governed by that agreement while it was in effect.

The alleged sharing of confidential information by Rye to a competitor of Mavel's occurred prior to the execution of the NDA and while the MOU was in effect. Because neither party disputes the enforceability or validity of the MOU, it is clear that the dispute, which concerns the alleged disclosure of confidential information that occurred some time before June 23, 2021, is governed by the MOU and therefore subject to arbitration.

Accordingly, the DTSA claim is subject to arbitration under the terms of the MOU. And

because the entire dispute underlying the DTSA claim is arbitrable, the Court sees no reason to stay the litigation and instead will dismiss that claim.

### B. Remaining State-Law Claims

The next issue concerns the remaining claims. Because those claims are asserted under state law, the Court must determine whether it has diversity jurisdiction over those claims or, if not, whether it should exercise its supplemental jurisdiction.

#### 1. Diversity Jurisdiction

Where a party seeks to invoke the jurisdiction of a federal district court under 28 U.S.C. § 1332, the parties must be completely diverse. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). Complete diversity does not exist where any plaintiff is a citizen of the same state as any defendant. *See id.* A corporation's principal place of business is relevant to determining its citizenship for jurisdiction purposes. *See* 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business"). However, the citizenship of an LLC is determined by the citizenship of its members. *See Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54-55 (1st Cir. 2006).

Mavel Americas is a Delaware corporation with its principal place of business in Massachusetts. Mavel Americas is therefore a citizen of Delaware and Massachusetts. Rye is a limited liability company with members who are citizens of Massachusetts. Rye is therefore a citizen of Massachusetts. Accordingly, there is no diversity of citizenship between Mavel Americas and Rye.

Mavel Americas is a signatory to the NDA, but it is not a party to this lawsuit. The Court must therefore determine whether it is an indispensable party to the state-law claims arising out of or related to the NDA.

Where a parent or subsidiary company is a signatory to contested contracts in a case, the signatory is normally an indispensable party to the action. *See, e.g.*, *H.D. Corp. of P.R. v. Ford Motor Co.*, 791 F.2d 987, 993 (1st Cir.1986) (noting that non-diverse parent company was an indispensable party because it was a signatory to the agreements at issue, among other reasons); *Puerto Rico Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriquena, Inc.*, 321 F.R.D. 475, 479-80 (D.P.R. 2017) (finding that a subsidiary who is a signatory to contracts that are "at the core of the controversy" is an indispensable party); *Lopez v. Shearson Am. Exp., Inc.*, 684 F. Supp. 1144, 1150 (D.P.R. 1988) ("The jurisprudence is fairly uniform in cases involving a corporate parent and subsidiary that where plaintiffs' claims are largely directed against the nondiverse corporation or where the corporation is a primary participant in the facts that give rise to the complaint, that corporation is an indispensable party.").

The Court sees no reason to depart from that principle here. Mavel Americas is a wholly owned subsidiary of Mavel. It is a signatory to the NDA, and it is the *only* signatory to the MOU. For those reasons, the Court finds that Mavel Americas is an indispensable party within the meaning of Fed. R. Civ. P. 19(b).

Because adding Mavel Americas would destroy diversity, the Court does not have subject-matter jurisdiction under 28 U.S.C. § 1332 over the claims based on state-law arising out of or related to the NDA.

### 2. <u>Supplemental Jurisdiction</u>

The next question is whether the Court should exercise supplemental jurisdiction over the state-law claims.

If an action includes both federal-law claims and state-law claims, then the district court may exercise supplemental jurisdiction over the state-law claims. 28 U.S.C. § 1367. However, where the claims based on federal law have been dismissed, or otherwise disposed of,

jurisdiction over the remaining state-law claims is based solely on supplemental jurisdiction. And a "district court has discretion to decline to exercise supplemental jurisdiction." *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010); 28 U.S.C. § 1367(c). In so doing, the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity." *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012); *see Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) (noting that "it can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts").

Here, the only federal claim is the DTSA claim, which is subject to arbitration. What remains are five state-law claims. Apart from the complaint and motions to dismiss, no substantial litigation has occurred. For that reason, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims.

Accordingly, because the Court declines to exercise its supplemental jurisdiction, these claims will be dismissed without prejudice.

## V. Conclusion

For the foregoing reasons, defendant's motion to dismiss is GRANTED as to Count 6, and the parties are directed to arbitrate the dispute set forth in Count 6 in accordance with the 2014 Memorandum of Understanding between Mavel Americas, Inc. and Rye Development, LLC. The Court declines to exercise supplemental jurisdiction over the remaining claims, which are accordingly DISMISSED without prejudice.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated: September 6, 2022 Chief Judge, United States District Court